UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

JOSEPH J. SERIO,

                    Plaintiff,

          v.                                        Case No. 04-C-0870

NEW WISCONSIN SERVICES, LIMITED
PARTNERSHIP d/b/a METRO MILWAUKEE
AUTO AUCTION,[1]

                    Defendant.

_____

## ORDER

Plaintiff Joseph J. Serio ("Serio") claims that his former employer, defendant

New Wisconsin Services, LP d/b/a Metropolitan Milwaukee Auto Auction ("the

Auction"), failed to accommodate his disability under the Americans with Disabilities

Act ("ADA") and terminated him for requesting medical leave in violation of the

Family and Medical Leave Act ("FMLA"). The Auction moves for summary judgment.

For the reasons stated below, the Auction's motion must be denied.

## BACKGROUND

Serio cannot speak or hear. His native language is American Sign Language

("ASL"). (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 1.) Serio has a limited

understanding of the English language. Serio can read and write at a third-grade

level. Serio cannot "lip read" although he can occasionally figure out one of the

---

[1]According to the defendant, its correct name is "New Wisconsin Services, LP d/b/a Metropolitan
Milwaukee Auto Auction. (*See* Defendant's Memorandum of Law in Support of its Motion for Summary
Judgment 2 n.1.)

words in a spoken sentence by watching lip movement.  (*Id.* ¶ 3.)  Serio cannot express himself orally but has a limited ability to communicate in written English. (Defendant's Statement of Proposed Findings of Fact ("DPFOF") ¶¶ 1-2; Plaintiff's Response to Defendant's Proposed Findings of Fact ("Pl.'s Resp.") ¶¶ 1-2.)

The Auction is a  wholesale automobile auction which brings together buyers and sellers of vehicles. Thousands of vehicles are registered for sale and are sold at the Auction during its weekly sales in an auction-style format. The Auction does not own these vehicles but is responsible for them at the Auction.  (DPFOF ¶ 4.)

Serio was hired by the Auction as a body shop technician on August 31, 2000. (DPFOF ¶ 7.)  Body shop technicians perform light to medium automotive body repair work   (*Id.* ¶ 5.)  Serio obtained the position with the assistance of the Wisconsin Division of Vocational Rehabilitation ("DVR").  At the time he was hired, Robin Kennedy was designated by the DVR to provide him assistance. (PPFOF ¶ 5.) At that time, his supervisor in the body shop was Eric Weis ("Weis"). Shortly after he was hired, Robin Kennedy met with Serio, Weis, Carol Bielski ("Bielski") and Michael Gonzalez ("Gonzalez") and explained to them that he needed to be provided with an ASL interpreter for job training, meetings, or any time more than rudimentary communication was required. At this meeting, Robin Kennedy furnished Weis and Gonzalez with various documents regarding communicating with the deaf and how to schedule an ASL interpreter. Among the documents she furnished was a document which explained how to arrange for an ASL interpreter and identified by name and address various agencies which provide ASL interpreters.  (*Id.* ¶ 6.)  At

the time that Serio was hired, the DVR provided him with an ASL interpreter which assisted him in the orientation and training. During the orientation, portions of the employee handbook were explained to Serio, particularly those involving employee benefits. The ASL interpreter did not explain the progressive disciplinary procedure to him. (*Id.* ¶ 7.)

Weis was Serio's immediate supervisor until Weis resigned on March 15, 2002. During the time that Weis was Serio's supervisor, Serio was never issued any disciplinary warnings. (*Id.* ¶ 8.) Throughout his employment, Serio's job performance was evaluated as being good and he regularly received pay increases. (*Id.* ¶ 9.) Weis worked with Serio to make sure that he understood what was going on in the department by summarizing for him in writing and with gestures what happened at departmental and safety meetings and what was expected of him as an employee. (*Id.* ¶ 10.) From the time Serio was hired until January 2002, he worked in the main lot, sometimes called the "North Lot." In January 2002, Serio was transferred to the South Lot where he worked by himself doing body work until early March 2002. Serio never understood why he was doing body work by himself in the South Lot. No one explained to him why he was moved there and no ASL interpreter was brought in to explain to him what was going on. (*Id.* ¶ 11.)

During early March 2002, Serio was transferred back to the Body Shop at the North Lot. When he received his first paycheck after returning to the North Lot, Serio was surprised to see that he was being paid substantially less than what he had been paid while working in the South Lot or while previously working in the North Lot.

When he received this paycheck, Weis was no longer his supervisor because he had resigned. (*Id.* ¶ 13.) When Serio received the paycheck with less pay than he was expecting, he requested a meeting with Scott Mitchem ("Mitchem"), who temporarily replaced Eric Weis after Eric Weis left. (*Id.* ¶ 14.)

During the week of March 25, 2002, a meeting was conducted with Serio, Mitchem, Gonzalez, Bielski, and Lucia Armiros ("Ms. Armiros"). Ms. Armiros is a friend of Serio's who knows ASL and came to the meeting at his request to serve as the translator because the Auction had not been providing translators for him and he needed to know what was happening. (*Id.* ¶ 15.) During this meeting, with the ASL translator, Gonzalez and Mitchem explained to Serio that the compensation method at the body shop had changed, but offered him a position as a Condition Report Writer ("C/R Writer") at the South Lot working with Laurie Czaplewski ("Czaplewski") as the supervisor. (Id. ¶ 16.) A C/R Writer inspects cars for damage and prepares reports estimating the cost needed to repair the vehicles. From time to time, an inspector may perform other tasks such as adding oil to vehicles and moving cars on the Auction's lots. (DPFOF ¶ 21.) Serio agreed to accept this position. (PPFOF ¶ 16.)

On April 8, 2002, Serio started at the South Lot in Czaplewski's department. On this day, Ms. Armiros again came with him to help translate during the initial training. (PPFOF ¶ 17.) After this initial training, Serio was sent to work at the Body Shop on the North lot again whenever they needed help. During April, he worked in the Body Shop because one of the Body Shop Technicians had knee surgery and

was on medical leave.  (*Id.* ¶ 18.)  When he returned to the South Lot in May 2002, Serio noticed that the procedures in the C/R Department had changed and he was not sure how to perform his job under the new procedures.  (*Id.* ¶ 19.)  On May 7, 2002, Laurie Czaplewski gave Serio a document entitled "Employee Warning Notice."  (*Id.* ¶ 20.)  When Serio worked in the Body Shop, the employees were told to leave when the work was completed. Serio was usually one of the last employees to leave. He would follow the other employees who were leaving and who would wave at him to follow them. This is what he did on May 6, 2002, which apparently was not the proper thing to do in Czaplewski's department.  (*Id.* ¶ 21.)  When Serio received the "Warning Notice" on May 7, 2002, he tried to explain to Czaplewski what had happened, but he was not sure that he understood Czaplewski or that she understood him because no ASL interpreter was present.  (*Id.* ¶ 22.)  Serio attempted to communicate with Czaplewski by writing crude notes on pieces of paper but it was very difficult for Serio to communicate in this manner due to his limited understanding of English.  (*Id.* ¶ 23.)  The note that Serio wrote on the notice reads: "Sometime no work in PM I not want bother Laurie so I Left Half hour Early."  (*Id.* ¶ 24.)  Because Serio did not understand what was going on, he contacted Robin Kennedy from the DVR and she arranged with Gonzalez to have an ASL interpreter present so that he could be properly trained in the C/R position and the new procedures in Czaplewski's department.  (*Id.* ¶ 25.)

On May 13, 2002, Chris Prudhom, a certified ASL interpreter, helped teach Serio the revised duties of the C/R position and helped him to understand the procedures in Czaplewski's department. Serio understood at that time that he needed to obtain Czaplewski's permission before leaving the job site. (*Id.* ¶ 26.) After May 13, 2002, Serio never left the South Lot prior to the end of the shift without first obtaining Czaplewski's permission. (*Id.* ¶ 27.) Czaplewski considered the warning that she issued on May 7, 2002, to be a "verbal warning," particularly because Gonzalez did not sign it. (*Id.* ¶ 28.) Czaplewski did not the consider the conduct of May 6, 2002, to be a serious infraction because she didn't believe Serio intentionally left early. (*Id.* ¶ 29.) Czaplewski had been told by Gonzalez to "cross her t's and dot her i's" when dealing with Serio because he was disabled, and Czaplewski believed that Gonzalez did not want him in the department. (*Id.* ¶ 30.)

Although Serio was trained to do C/R writing, during July, August, and September 2002, Czaplewski assigned Serio the tasks of checking and changing the oil on cars that came in, checking and adjusting tire pressure on these cars, and flagging cars with improper tires. (*Id.* ¶ 31.) Several months after Serio started in the C/R position, another employee was hired to work in the department as a C/R Writer. During July or August 2002, Serio discovered that the Auction was advertising for a body shop technician in the newspaper. (*Id.* ¶ 32.) At the end of July 2002, Serio was again sent to the North Lot to work in the Body Shop doing taping, polishing, and buffing of vehicles because they needed extra help. He worked there for approximately two weeks. At that time, Wayne Oldenburg

("Oldenburg") was supervising the Body Shop and Serio reported to him.  (*Id.* ¶ 33.)

While working in the Body Shop during August 2002, Serio expressed to Oldenburg

his desire to continue working in the Body Shop at the North Lot rather than in the

C/R department at the South Lot.  Using hand-written notes, Serio told him that he

wanted an ASL interpreter so that he could explain to him and Gonzalez what he

was requesting and they could explain to him what was available.  Oldenberg

indicated that he would contact Gonzalez to arrange for an ASL interpreter.

Oldenburg also told him that he was to return to the C/R department at the South Lot

on August 12, 2002.  (*Id.* ¶ 34.)

When Serio returned to the South Lot on August 12, 2002, he was confused

because Czaplewski had told him that he could stay at the Body Shop permanently.

Serio then wrote an e-mail to Oldenburg asking if he was interested in having him

return to the North Lot.  (*Id.* ¶ 35.)

The e-mail dated August 12, 2002 reads as follows:

Hi Wayne
Laurie said she thought I stay at B/Shop for good.  That what Tom told
her.  I'm not sure, if we misunderstand commicate what we wrote paper
last Friday.  that I thought I'm back to CR (South Main) today. I would
like to know IF you in interesting me to back there ? please feel free to
let me know.  Have a good day
Joe Serio

(*Id.* ¶ 36.)  Later on August 12, 2002, Gonzalez wrote the following e-mail to Serio:

Joe, We seem to have some confusion about what is going on.  I think
we need to get in touch with Robin Kennedy and schedule a meeting.
I have misplaced her phone number.  Do you have it?  I believe that
Wayne had a meeting with you last week & that he does not seem to
have the position you desire.  For now we need you to report to Metro
South, but I really want to get together with Robin A.S.A.P.

(*Id.* ¶ 37.)  On August 13, 2002, Serio sent an e-mail back to Gonzalez giving him the name and phone number of the DVR counselor assigned to him (Kim Bruno), the name and phone number of Chris Prudhom, the certified ASL interpreter recommended by DVR who interpreted during his C/R training session in May, and the phone number for the Interpreter Coordination Service. (*Id.* ¶ 38.)  Gonzalez never contacted Serio and never provided an ASL interpreter in response to Serio's request.  (*Id.* ¶ 39.)  On August 14, 2002, Gonzalez and Serio met and exchanged crude notes.  In the notes, Serio tried to tell him to contact the certified interpreter (Chris Prudhom) directly rather than making a request through the DVR counselors which just tended to waste time.  (*Id.* ¶ 40.)  The relevant portion of the note of August 14, 2002 reads as follows:  "Forget with Robin or Kim  Waste our Time. Can you Call Chris or other. I send you E-Mail with z phone no,"  (*Id.* ¶ 41.)

After this meeting with Gonzalez, Serio became increasingly stressed over not knowing what was happening with his job assignment. Several weeks after the meeting on August 14, 2002, Serio approached Gonzalez and asked him whether he had requested the interpreter. Gonzalez responded by writing "What for?"  (*Id.* ¶ 42.)  After Gonzalez was non-responsive to his requests for an interpreter, it seemed to Serio that Gonzalez had little interest in communicating with him and, from Gonzalez's facial expression and lip movements, Serio "just knew that Gonzalez was not going to ask for an interpreter anymore." (*Id.* ¶ 43.)  During this time in August and September 2002, Ms. Armiros was not available to interpret for him because she was caring for her father who was near death.  (*Id.* ¶ 44.)

On August 19, 2002, Serio was not feeling well at work so he asked Gonzalez if he could take a sick day and leave. When Gonzalez asked him about the problem, Serio attempted to explain that he was stressed and that he was aching all over his body. (*Id.* ¶ 45.) While Gonzalez allowed Serio to take the sick day, he also gave him an Employee Warning Notice at the same time. (*Id.* ¶ 46.) No ASL interpreter was provided when Gonzalez gave Serio this warning notice and Serio did not understand why it was given to him. (*Id.* ¶ 47.) Serio never did receive an explanation as to whether he was going to return to the Body Shop full time or whether he was going to continue in the C/R department at the South Lot. He continued to report to work at the South Lot since he assumed that this was where he was suppose to be. (*Id.* ¶ 48.)

On September 11, 2002, Czaplewski gave Serio another warning notice. At the time she gave Serio this notice, no ASL interpreter was provided to explain it to him or to explain what he had done wrong. (*Id.* ¶ 49.) As best as he could understand, he was given the notice because he was standing in the wrong location. (*Id.* ¶ 50.) Serio was standing near a hallway window looking out for the next load of cars coming into the lot because he had completed the work on the cars in the lot. As best as he could understand, for some reason, this was not the right location to be waiting. (*Id.* ¶ 51.) The top portion of the warning notice of September 11, 2002, was completed by Czaplewski on September 11, 2002, and the bottom portion was completed by Gonzalez on September 12, 2002, after he determined what discipline would be appropriate. (*Id.* ¶ 52.) Czaplewski presented the warning notice to Serio

immediately after she saw him standing near the window because it would lose its impact if given later. (*Id.* ¶ 53.) The copy of the warning notice given to Serio did not contain the notation on the bottom that "Next violation of Company Policy will result in Termination of employment." (*Id.* ¶ 54.) Serio signed the notice at the space in the middle of the document and not at the employee signature space at the bottom of the document where the employee makes the following acknowledgment: "My signature below acknowledges that I have been advised of the action to be taken subsequent to this reprimand." (*Id.* ¶ 55.)

Prior to September 26, 2002, Serio told Czaplewski that he was going to need surgery on his knee. (*Id.* ¶ 56.) Serio was in pain while walking in the lot and explained to her using gestures and notes about the problems he was having with his knee and his need for surgery when the hospital called work about the surgery. (*Id.* ¶ 57.) On Thursday, September 26, 2002, since work was not very busy in the C/R Department, Serio wrote a note to Czaplewski asking her if he could go the Human Resources Department to see Carol Bielski. (*Id.* ¶ 58.) At the time Serio provided her with this note, he used gestures to explain that his request had to do with the surgery on his knee. (*Id.* ¶ 59.) In response, she wrote "I'll call Carol." After talking to Carol Bielski, she wrote "2:30" on the note to indicate when he could go. On the note he also told her he needed to pick up his paycheck since he would be off the following day. (*Id.* ¶ 60.) At a time close to 2:30 p.m., Czaplewski used gestures to tell Serio that he could leave. She used the "get out of here" gesture which involved waiving an open hand at him. This is the same gesture she used

when telling him that he could go home early. (*Id.* ¶ 61.) Czaplewski did not use the "come back" gesture which would involve combination of the "get out of here" gesture and the "come to me" gesture. (*Id.* ¶ 62.) There was nothing on the written document Serio and Czaplewski exchanged indicating that Serio was suppose to return to work after punching out for the meeting with Bielski at the North Lot. (*Id.* ¶ 63.) When Czaplewski signaled to Serio that he could leave, he went to the time clock and punched out. Czaplewski saw him punch out. (*Id.* ¶ 64.) The time records show that Serio punched out at 2:23 p.m. on September 26, 2002. (*Id.* ¶ 65.) After Serio punched out at the time clock, he drove to the North Lot where the HR department was located. (*Id.* ¶ 66.) At the North Lot, Serio met with Bielski. No ASL interpreter was furnished for this meeting. During the meeting, Serio and Bielski used crude written notes to communicate to each other. (*Id.* ¶ 67.) During his meeting with Bielski, Serio tried to explain that he needed to take leave for the knee surgery and needed to know the procedures for requesting and obtaining leave. Bielski tried to explain the procedures to him with notes as well. They spent more than an hour passing the notes back and forth. (*Id.* ¶ 68.) The meeting was very frustrating for Serio because he was not sure that she understood what he needed and he was not sure that he understood the procedure. (*Id.* ¶ 69.) At the conclusion of the meeting with Bielski, Serio picked up his paycheck and went home. Bielski did not tell him that he was to go back to work. (*Id.* ¶ 70.) Serio did not go back to work at the South Lot because he thought that Czaplewski had given him permission to leave for the day. (*Id.* ¶ 71.) On September 30, 2002, when Serio

returned to work, Czaplewski presented him with another "Employee Warning Notice." (*Id.* ¶ 72.) Unlike prior notices, this one was fully completed and contained Gonzalez's signature at the time it was presented to Serio. (*Id.* ¶ 73.) No ASL interpreter was provided to Serio during the meeting on September 30, 2002. (*Id.* ¶ 74.) The document was very confusing to Serio because it indicated something had happened on Friday, September 27, 2002, when that was the day he had been off from work on vacation. (*Id.* ¶ 75.) Czaplewski and Serio exchanged written notes during the meeting on September 30, 2002. In the notes, Serio tried to explain to Czaplewski that she had told him to leave early and he thought she had given him permission to leave. (*Id.* ¶ 76.)

Czaplewski issued Serio the Employee Warning Notice on September 30, 2001, because Gonzalez ordered her to do so. (*Id.* ¶ 77.) Czaplewski did not believe that Serio's conduct on September 26, 2002, should have resulted in termination because it was just a mis-communication between her and Serio. (*Id.* ¶ 79.) Czaplewski expected that Gonzalez would issue Serio another write up and then a three-day suspension before terminating him because these were the steps normally taken before discharging an employee. (*Id.* ¶ 80.) No one else in the C/R department has been discharged for leaving early. (*Id.* ¶ 81.) It is unclear who made the discharge decision. Czaplewski testified that Gonzalez made the decision because she only had the authority to issue verbal warnings and did not agree with the termination decision. (*Id.* ¶ 82.) Gonzalez testified that Czaplewski made the termination decision because the only writing on the discharge form dated

September 30, 2005, is his signature. (*Id.* ¶ 82.) The notation in the Correction Action Section of the September 30, 2002, "Employee Warning Notice" states "Termination 3 written warnings." (*Id.* ¶ 83.) At the time of his termination, Serio had been issued only one written warning and two verbal warnings because the warnings dated May 7, 2002, and August 19, 2002, were both considered verbal warnings. (*Id.* ¶ 84.) No other employee has been terminated after receiving only one written warning. (*Id.* ¶ 85.) The statement on the September 30, 2003 "Employee Warning Notice" form indicating that Serio had received three written warnings was not true. (*Id.* ¶ 86.)

The Auction's progressive disciplinary procedure involves verbal warnings, followed by written warnings, disciplinary suspension, and then discharge. (*Id.* ¶ 87.) The progressive disciplinary procedure is used in every situation except employee theft. (*Id.* ¶ 88.) The progressive disciplinary system was developed so that there would be a uniform policy which treated everyone the same and so that employees could be educated when they engaged in unacceptable behavior and given a fair opportunity to correct that behavior. (*Id.* ¶ 89.) Gonzalez also testified that another purpose of going through the steps of progressive discipline is "so we have an opportunity to communicate with the employee on exactly what's expected and to gain the employee's opinion of [what] happened and to come to a resolution." (*Id.* ¶ 90.) There was a two-step procedure used by Czaplewski and Gonzalez to issue discipline that was more than a verbal warning. (Czaplewski Dep. pp. 26-27, 30-35.)

Czaplewski first completed the top portion of the "Employee Warning Notice" describing the "Details of the Infraction" then presented the form to the employee for signature and discussion. (Czaplewski Dep. pp. 30-35). After meeting with the employee, Czaplewski then forwarded the partially-completed form to Gonzalez to determine the appropriate discipline. (Czaplewski Dep. pp. 32-35). After consulting with Czaplewski and deciding what discipline to impose, Gonzalez would then complete the bottom section of the form entitled "Corrective Action," sign it, and have the employee acknowledge at the appropriate signature space on the bottom of the form that he was "advised of the action to be taken subsequent to this reprimand." (*Id.* ¶ 91.) The decision to terminate Serio was made prior to the time anyone met with him to find out why he went home after the meeting with Bielski on September 26, 2002. (*Id.* ¶ 92.)

On April 9, 2003, Serio filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right to sue letter on June 17, 2004. On September 13, 2004, Serio filed this suit against the Auction and several other defendants alleging age and disability discrimination. On January 13, 2005, pursuant to the parties' joint stipulation, the court dismissed Serio's age discrimination claims as well as all claims asserted against defendants other than the Auction. The court granted Serio's December 20, 2004 motion for leave to file an amended complaint. In his amended complaint, Serio alleges that the Auction failed to accommodate his disability in violation of the ADA and terminated him in retaliation for requesting a medical leave of absence. On

January 27, 2006, the Auction filed a motion for summary judgment on Serio's ADA and FMLA claims.

## ANALYSIS

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

I.      ADA

"The ADA provides that a covered employer shall not 'discriminate against a qualified individual with a disability because of the disability of such individual.' 42 U.S.C. § 12112(a). 'Discrimination,' under the ADA, includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,'

unless the employer 'can demonstrate that the accommodation would impose an undue hardship on the operation of the business.' § 12112(b)(5)(A). Thus, the ADA requires employers to reasonably accommodate the limitations of its disabled employees. *See Toyota*, 534 U.S. at 193, 122 S. Ct. 681." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796-97 (7th Cir. 2005).

"To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). As to the third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.' *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable only if it bears responsibility for the breakdown of the interactive process. *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)." *Sears, Roebuck & Co.*, 417 F.3d at 797.

In this case, the Auction does not dispute that Serio is a qualified individual with a disability or that the Auction was aware of Serio's disability. The Auction argues that it reasonably accommodated Serio's disability, and if Serio felt that the accommodations were insufficient, he failed to notify the Auction.

The employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations. *See U.S. Airways, Inc. v.*

*Barnett*, 535 U.S. 391, 400 (2002). "[T]he employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available. *See Beck*, 75 F.3d at 1134-36. Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. *See Bultemeyer*, 100 F.3d at 1285. In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *Sears, Roebuck & Co.*, 417 F.3d at 804. If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck*, 75 F.3d at 1135.

Viewing the facts in the light most favorable to Serio, a reasonable jury could conclude that Serio was not provided a reasonable accommodation and that the Auction was responsible for the breakdown of the interactive process.

When the Auction hired Serio, Robin Kennedy, an employee of the Wisconsin Division of Vocational Rehabilitation, informed the Auction that Serio required an ASL interpreter for job training, meetings, or any time more than rudimentary communication was required. The Auction did not provide ASL interpreters for Serio, but Serio or the DVR arranged for an ASL interpreter to assist Serio during his (1) initial orientation and training, (2) the meeting in March 2002 during which the Auction offered Serio a position as a C/R Writer, (3) the initial training in April 2002 for the C/R Writer position, and (4) subsequent training on May 13, 2002, to learn the revisions to the C/R position. Czaplewski and Gonzalez were aware that Serio required the assistance of an ASL interpreter in these instances and that the use of an ASL interpreter was an effective accommodation. The Auction did not provide an ASL interpreter to assist Serio during any disciplinary meeting.

Neither did the Auction provide an ASL interpreter when Serio requested an ASL interpreter in August 2002. In August 2002, Serio requested an ASL interpreter. On August 12, 2002, via an e-mail message, Gonzalez appears to agree that an ASL interpreter is needed to clear up "some confusion about what is going on" and asks for the telephone number of Serio's contact at the DVR. Serio provides Gonzalez with the contact information the next day. On August 14, 2002, Serio meets with Gonzalez in person and indicates that it would be quicker to call the ASL interpreter directly rather than contact someone at the DVR. In response, Gonzalez takes no action. Several weeks later, Serio asks Gonzalez whether he has arranged for an interpreter and Gonzalez simply writes, "What for?" At a minimum,

Gonzalez's e-mail suggests that the Auction knew that communicating with Serio via gestures and written notes was not entirely effective. A reasonable jury could also find that the Auction is responsible for the breakdown of the interactive process. *See Sears, Roebuck & Co.*, 417 F.3d at 804 ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark.").

In support of its motion for summary judgment, the Auction claims that it is undisputed that (1) the Auction provided an interpreter for Serio during orientation; (2) Serio regularly and effectively communicated through written notes with his supervisors; (3) Serio never informed his supervisors that he was having difficulty understanding or communicating during disciplinary meetings. (*See* Defendant's Reply Br. 1-2.) To the contrary, Serio disputes each of these facts. (See Pl.'s Resp ¶ 22 (the Auction did not supply any interpreters); Pl.'s Resp. ¶ 29 (Serio requested an ASL interpreter on several occasions because of an inability to communicate with his supervisors.)) Because there is a genuine issue of material fact as to whether there was any basis for the Auction to believe that an ASL interpreter was needed and whether the Auction is responsible for the breakdown in the interactive process, the court must deny the Auction's motion for summary judgment.

## II.    FMLA

Auction argues that it is entitled to summary judgment for three reasons: (1) Serio abandoned his claim during his deposition by failing to demonstrate a sufficient understanding of his FMLA claim; (2) his FMLA claim, first asserted on

December 20, 2004, when Serio filed a motion to amend his complaint, is time-barred; and (3) Serio cannot establish an FMLA retaliation claim because neither Czaplewski nor Gonzalez knew that he was requesting FMLA leave.

Serio did not abandon his FMLA claim during his deposition. During his deposition, Serio pointed out that he lost his job on the same day that he requested medical leave. (Plaintiff's Amended Brief in Opposition to Defendant's Motion for Summary Judgment 28; Serio Dep. 181.) The Auction argues that Serio abandoned his FMLA claim through the following exchange:

> Q.    I was asking about this lawsuit and whether or not you are claiming that you were terminated by the Auction in retaliation for requesting the leave of absence for knee surgery.
>
> A.    No.  That issue?  No, I don't recall that.
>
> . . .
>
> Q.    Do you have any reason to believe that your termination had anything to do with the fact that you requested time off for your knee surgery?
>
> . . .
>
> A.    You know, I didn't really think about that.  I just remember they said I apparently walked out.  But that is all.  If there is more to that, I don't remember.

(Defendant's Memorandum of Law in Support of its Motion for Summary Judgment 20 n.8; Serio Dep. 139-40.)  Serio did not state unequivocally that his termination had no relationship to his request for medical leave.  Serio's last statement in this exchange suggests that he was attempting to recall what he believed at the time of

-20-

his termination. Serio does not abandon his FMLA claim merely by stating that it did not occur to him that at the time that he was fired that his termination was illegal.

Serio's claim is not time-barred. The statute of limitations for bringing an FMLA claim is two years. See 29 U.S.C. § 2617(c)(1). Serio first raised his FMLA claim in his December 20, 2004 motion for leave to amend his complaint, more than two years after he was terminated on September 30, 2002. The amendment of a pleading, however, relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). Serio's FMLA claim arose out of the same termination that is the subject of Serio's original complaint. Therefore, Serio's FMLA claim relates back to September 13, 2004, the date that Serio filed his original complaint, and falls within the statute of limitations.

Finally, Serio has demonstrated that there is a genuine issue of material fact as to whether Czaplewski knew that Serio was requesting leave for knee surgery. (*See* Serio Aff. ¶¶ 32-33; PPFOF ¶¶ 56-59.) Czaplewski testified that she did not know that Serio had knee problems and needed surgery. (Czaplewski Dep. 40-41.) Also, at one point during his deposition, Serio stated that Bielski is the first person he talked to about his knee surgery, (Serio Dep. 135), an apparent inconsistency with other portions of his deposition testimony and statements within his affidavit. (*See* Serio Aff. ¶¶ 32-33; PPFOF ¶¶ 56-59.) However, the court should not resolve these evidentiary conflicts in deciding a motion for summary judgment.

*See Anderson*, 477 U.S. at 255 (stating that any doubt as to the existence of a material fact is to be resolved against the moving party). The court, therefore, denies Auction's motion for summary judgment with respect to Serio's FMLA claim.[2]

Accordingly,

**IT IS ORDERED** that Auction's motion for summary judgment be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this   22nd   day of August, 2006.

BY THE COURT:

  s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge

---

[2]In its reply brief, the Auction also argues that Serio has offered no evidence, other than timing, to suggest a causal connection between his leave request and his termination. (Auctions Reply Br. 15.) Auction, however, did not raise this argument until its reply brief, and the court, therefore, does not consider it. *See, e.g., Kelso v. Bayer Corporation*, 398 F.3d 640, 643 (7th Cir. 2005) (stating that arguments raised for the first time in a reply brief are waived).